**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES SHAW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19 C 8415** |
| | ) | |
| **ILLINOIS SPORTSERVICE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Plaintiff James Shaw, who is disabled, has sued the defendant, Illinois

SportService, Inc. (ISS), for violating the Americans With Disabilities Act (ADA).  Shaw

applied and interviewed for a porter position with ISS, a company that provides food and

beverage services at Guaranteed Rate Field, where the Chicago White Sox play.  Shaw

contends that ISS discriminated against him on the basis of his disability when it failed

to hire him for the position (count 1) and failed to provide a reasonable accommodation

during the job interview (count 2).  *See* 42 U.S.C. § 12102.  ISS has moved for

summary judgment on Shaw's ADA claims.  For the reasons stated below, the Court

grants the motion.

**Background**

The following facts are undisputed except where otherwise noted.  In May 2009,

Shaw was criminally assaulted and shot in the head, which caused him the following

impairments:  a traumatic brain injury; global aphasia, a language disorder that causes

difficulty with speaking, reading, and writing; motor speech apraxia, a language disorder that causes difficulty with producing sounds of letters and words while speaking; post-traumatic seizure disorder; and post-traumatic stress disorder (PTSD). Def.'s Stat of Facts ¶¶ 5-7 (dkt. no. 65). In addition, Shaw was diagnosed with bipolar disorder sometime before May 2009. Pl.'s Am. Compl. ¶¶ 11-12 (dkt. no. 24).

## A.    Shaw's background

During her deposition, Dr. Terri Richmond, Shaw's mother, testified that on a typical day, Shaw wakes up, makes himself coffee and breakfast, performs chores around the house, such as sweeping, mopping, taking out the garbage, cleaning the cat pans, wiping the counters, and doing the laundry. Def.'s Ex. 3, Richmond Dep. 99:3-100:5 (dkt. no. 65-4). She also testified that she frequently sends him to the store to purchase household items and groceries. *Id.* at 42:4-43:2. Dr. Richmond testified that there are other activities Shaw performs independently, such as going to the gym and taking the train. *Id.* at 97:13-21.

ISS objects to Shaw's reliance on Dr. Richmond's deposition testimony. *See, e.g.*, Def.'s Resp. to Pl.'s Stat. of Facts ¶ 3 (dkt. no. 82) ("whether Plaintiff's mother can send him to the store . . . is not relevant to whether Shaw is a qualified individual under the [ADA]"). ISS also argues that it cannot verify some of the factual contentions in Dr. Richmond's testimony because Shaw submitted that he cannot—and has not—been deposed in this case. *Id.* ¶ 5 ("Plaintiff stated that he was not capable of being deposed in any capacity in this litigation due to his disabilities.").

### 1.    Social security disability insurance benefits

Based on Shaw's disabilities, Dr. Richmond applied for social security disability

2

insurance benefits on his behalf, which Shaw has received since 2010.  Def.'s Stat. of Facts ¶ 8.  ISS cites to the SSA record, which includes Dr. Richmond's submissions about Shaw's capabilities and limitations.  *Id.* ¶ 9; *see also* Def.'s Ex. 4, SSA Rec. at SSA000434-436 (dkt. no. 65-5).  Shaw generally objects to ISS's invocation of the SSA record on the basis that is unsworn and unauthenticated.  *See generally* Pl.'s Resp. to Def.'s Stat. of Facts (dkt. no. 70).  The Court notes that ISS filed an authenticated copy of the record with the Court, and Shaw does not dispute that Dr. Richmond made representations about his limitations on his behalf.  He contends, however, that ISS's invocation of Dr. Richmond's representations to the SSA in Shaw's ADA lawsuit is a "misleading" use of the statements because Dr. Richmond's representations were "offered in response to" specific SSA questions and not for the purpose of this lawsuit.  Pl.'s Resp. to Def.'s Stat. of Facts ¶ 9.

### 2.    Medical evaluation and treatment

In October and December 2018, Dr. Mary Hoban, a speech pathologist, evaluated Shaw and assessed that he was incapable of accurately answering simple and personal yes or no questions; identifying an item from pictures; following one-step simple, automatic commands (e.g., "point to your nose" or "show me your stomach") even with gestural cues; or identifying written words.  Def.'s Stat. of Facts ¶¶ 19-20, 22-25; *see also* Def.'s Ex. 6, Rush Med. Rec. at RUSH001986-2067 (dkt. no. 65-7).

Shaw points out that his medical records from January 2019 indicate that he "can perform simple commands and is able to do certain actions mostly if they are demonstrated to him first."  Pl.'s Resp. to Def.'s Stat. of Facts ¶ 13 (citing Rush Med. Rec. at RUSH000375).  In February 2019, however, Dr. Hoban concluded that Shaw's

3

ability to follow one-step commands without gestural cues had decreased and that he could not accurately identify items in pictures (e.g., identifying a toothbrush from a display of eight pictures of items).  Def.'s Stat. of Facts ¶ 26-27; *see also* Def.'s Ex. 5, Hoban Dep. 57:5-59:17 (dkt. no. 65-6).

## B.    Porter position

To establish the responsibilities—including prerequisites and essential functions—of porters, ISS relies on its written job description as well as the declaration and deposition testimony of William Washington, who worked as a porter from 1997 to 2002 and as a commissary manager with ISS since 2013.  Pl.'s Ex. 1, Porter/Commissary Worker Job Description (dkt. no. 24-1); Def.'s Ex. 2, Washington Decl. ¶ 2 (dkt. no. 65-3); Def.'s Ex. 9, Washington Dep. 29:2-11, 30:7-16, 47:24-48:24 (dkt. no. 65-10) (testifying regarding his own experience as a porter and porter responsibilities generally).

Porters generally assist commissary managers and supervisors "in maintaining inventory and independently delivering product orders to various outlets on all floors within the stadium prior to and during events" including concession, permanent, and portable locations.  *Id.* ¶ 36.  Porters are assigned to duties in either "concession" or "warehouse," although ISS expects individuals hired for the porter position to perform the tasks of either assignment, because they can be assigned to either role.  *Id.* ¶ 42; *see also* Washington Dep. 60:14-17 (explaining that there are not two types of porters, "they're all one porter" who are "just assigned to do different duties").  ISS emphasized this point during oral argument and indicated that porters can be assigned to different roles on a day-to-day basis.

When working warehouse duty, porters typically work in the warehouse; "read delivery forms and perform math to verify and count all product delivered to the warehouse and sign and verify delivery receipts"; and "need to read and count product and read and interpret delivery forms and know where all product is stored in the warehouse."  Def.'s Stat. of Facts ¶¶ 43-44; *see also* Washington Dep. 59:11-60:13.  In contrast, when working concession duty, porters stock the concession stands and bar locations within the stadium; they must also "continuously and independently verify delivery orders, as well as deliver and unload thousands of dollars of product throughout the stadium."  Def.'s Stat. of Facts ¶¶ 41, 47.  In performing these duties, porters receive orders from concession locations, bring the orders to warehouse supervisors, and work with porters in the warehouse to pull the products from the warehouse.  *Id.* ¶¶ 54-56.

### 1.    Job prerequisites and essential functions

ISS contends that porter applicants must satisfy certain prerequisites, which it identifies on the written job description as "Knowledge, Skills & Abilities":  (1) "[m]ust be pleasant, courteous with ability to adhere to the Company's GuestPath Universal Service Standards"; (2) "[a]bility to work in a fast paced environment"; (3) "[a]bility to work cooperatively with others"; (4) "[a]bility to read and interpret delivery forms and purchase orders"; (5) "[b]asic math skills for counting inventory"; and (6) "[a]bility to follow job procedures and supervisor instructions."  Porter/Commissary Worker Job Description at 1-2.

In addition, ISS's written job description states that porters perform the following "Essential Functions":  (1) "[d]elivers food, beverage and other products throughout the

facility, in an efficient and timely manner"; (2) "[s]tocks product in commissary; ensures that inventory levels of supplies are maintained"; (3) "[r]eports all needed commissary repairs to the supervisor"; (4) "[k]eeps work are and equipment neat and clean"; and (5) "[p]erforms other duties as assigned." *Id.* at 1.

### 2. Porter position interview

On February 19, 2019, Shaw presented for a job interview for a porter position with ISS. Dr. Richmond accompanied him to the interview. Before the interview started, Dr. Richmond told the interviewer, human resources manager Mary McCain, that Shaw suffers from a brain disorder and has problems with communication, and she asked to sit at the interview table with Shaw to give him emotional support. McCain stated that parents are generally expected to wait in the lobby, Def.'s Ex. 10, McCain Dep. 125:5-19 (dkt. no. 65-11), but because of Shaw's limitations, she allowed Dr. Richmond to stay in the room and sit at the same table as Shaw.[1] Dr. Richmond Dep. 150:2-5.

### a. General questions

ISS contends that McCain posed general open-ended questions to assess his personality and ability to communicate and that "Dr. Richmond was allowed to, and did, provide some responses to those questions on Shaw's behalf." Def.'s Stat. of Facts ¶ 65; McCain Dep. 178:6-15 (testifying that she asked Shaw, "'[w]hat does customer

---

[1] In his amended complaint, Shaw alleged that during the interview, McCain required her to sit at a different table in the room that was farther away until later in the interview, prevented her from speaking or interacting with Shaw, made scowling facial expressions at her when she tried to speak to him, and was generally rude and disrespectful to her. Pl.'s Am. Compl. ¶¶ 20-21. Shaw did not submit these contentions in his statement of facts under Local Rule 56.1, and the record contains no evidence supporting them.

service mean to you?").  Shaw does not dispute these factual contentions.  Pl.'s Resp. to Def.'s Stat. of Facts ¶ 65.  During the fifteen-minute interview, McCain used a standard interview form to ask Shaw questions in verbal or written form.  Def.'s Ex. 1, McCain Decl. Ex. C, Shaw Interview Form (dkt. no. 65-2).  McCain determined that Shaw could complete the physical requirements of the job, such as being available to work nights and weekends and standing the entire length of a shift.  *Id.*  The parties also agree that McCain determined that Shaw could keep the work area and equipment neat and clean—which ISS describes as one of the position's essential functions.  Def.'s Resp. to Pl.'s Stat. of Facts ¶ 17; Porter/Commissary Worker Job Description at 1.

### b.  Math questions

McCain then asked Shaw to solve the following math problems, the first two of which appear on the standard interview form:  "If a key chain costs $10.25, and a guest orders 3 key chains, what is the total amount of the order?"  Def.'s Stat. of Facts ¶ 69.  McCain also restated the question as "what is 3 times 10.25?"  *Id.*  Next, she asked "if an order costs $27.00 and a customer gives you a $50 bill, how much change would you give back?"  *Id.* ¶ 70.  She also restated the question as "what is 50 minus 27?"  *Id.*  Finally, McCain asked Shaw "if he was asked to deliver 5 boxes to a concession stand and then asked to deliver 20 more, how many boxes would he need?"  *Id.* ¶ 71.  McCain then wrote out the math problem for Shaw as "5 boxes + 20 boxes."  *Id.*  Shaw did not answer any of the questions correctly.

The parties dispute whether the interview process and form include questions that genuinely aid the interviewer in assessing whether the candidate is qualified for the position, consistent with the claimed prerequisites identified in the "Knowledge, Skills &

Abilities" section of the job description.  Porter/Commissary Worker Job Description at 1-2.  For instance, Washington testified that porters are not expected or even allowed to handle money given to them by a customer, yet McCain's first interview question concerned a financial transaction with a customer.  Washington Dep. 92:19-21. Moreover, Shaw contends that McCain did not inquire into whether he satisfied the job's supposed prerequisites, *see* Pl.'s Resp. Br. at 6 (dkt. no. 72), but ISS disagrees. Specifically, ISS contends that the interview is "aimed at inquiring into whether a candidate has basic math skills for counting inventory, as well as questions about prior work experience. . . and what makes them the best candidate for the position."  Def.'s Resp. to Pl.'s Stat. of Facts ¶ 14.

ISS declined to hire Shaw for the position.

**C.    Shaw's ADA suit**

In count one, Shaw contends that ISS violated the ADA by failing to hire him because of his disability.  Am. Compl. ¶¶ 38.  In count two, Shaw contends that ISS violated the ADA by failing to provide him with a reasonable accommodation and exposing him to hostile and humiliating behavior during the job interview. [2]  *Id.* ¶¶ 40-44.  Shaw contends that he can perform the essential functions of the position with a reasonable accommodation.

---

[2] As previously noted, Shaw did not include in his statement of facts under Local Rule 56.1 factual contentions regarding McCain's allegedly "hostile and humiliating" behavior and preventing Dr. Richmond from providing emotional support to him during the interview.  *See* Am. Compl. ¶ 44. Thus the Court will address the second count of Shaw's complaint only with respect to ISS's alleged failure to provide an accommodation to Shaw that would allow him to perform the essential functions of the porter position.

Shaw retained an expert, Dr. Leslie Freels Lloyd, a vocational rehabilitation consultant, who concluded that Shaw could perform the essential functions of the porter job with what she described as reasonable accommodations. Pl.'s Stat. of Facts ¶ 36; *see also* Pl.'s Ex. B, Lloyd Expert Rep. (dkt. no. 73). Dr. Lloyd's methodology included reviewing several documents—including the porter job description, some of Shaw's medical records, discovery evidence and filings (e.g., deposition testimony, amended complaint and answer)—and conducting two phone interviews with Dr. Richmond about Shaw's functional capabilities. Lloyd Expert Rep. at 10, 42-43. Dr. Lloyd opines that Shaw is capable of new learning "through repeat demonstration, as indicated by his ability to complete household tasks and minor household repairs." Pl.'s Stat. of Facts ¶ 32 (citing Lloyd Expert Rep. at 29). Dr. Lloyd also characterizes the porter position as two different jobs—"concession porter" and "warehouse porter." Lloyd Expert Rep. at 32-33. ISS objects to this characterization; as previously noted, ISS says that it treats the position of porter as a single position and expects all porters to perform the tasks of both warehouse and concession assignments. Def.'s Resp. to Pl.'s Stat. of Facts ¶¶ 36-39.

Dr. Lloyd opines that Shaw can perform the functions of a porter, whether assigned to concession or the warehouse, with a reasonable accommodation. With respect to warehouse duties, Dr. Lloyd says that Shaw would need "increased time with a focus on demonstration and repetition" with respect to "all aspects of training." *Id.* at 33. Further, she states that "he would most likely benefit from gestural cues (e.g., pointing where something should be placed or which direction to go), and visual cues (e.g., pictures of product placed on product order sheets, the floor, etc.)." *Id.* Dr. Lloyd

also opines that Shaw would "benefit from peer support/natural supports in the form of concession porters verifying he has chosen the correct product and verifying the amount of product placed on the cart." *Id.* "Lastly," she says, "he would benefit from the already in place supervisory role of having the supervisor verify the correct product and amount prior to the concession porter taking the product to the concession stand." Regarding concession porter duties, Dr. Lloyd opines:

> Mr. Shaw may require modified training upon hire, including increased time, with a focus on demonstration and repetition. He would benefit from gestural and visual cues (as described above), and from peer/natural supports. I would recommend that, when Mr. Shaw is being trained in how to bring order forms from the concession stand to the warehouse, someone should show Mr. Shaw the route that he needs to take through the facility in order to arrive at the warehouse by physically accompanying him from the concession stand to the warehouse with an order form. This serves as an example of demonstration, one of the primary reasonable accommodations from which he can benefit. Once at the warehouse, someone should show Mr. Shaw how to present the order form to the warehouse personnel, and how to accompany the warehouse porter into the warehouse where the warehouse porter will fill the order. Once the order has been filled, someone should show Mr. Shaw how to return from the warehouse to the concession stand, by physically accompanying him and by retracing the same route that was used to travel from the concession stand to the warehouse. His training should include a patient instructor who uses gestural cues. That instruction process should be repeated until Mr. Shaw is able to perform those actions independently. . . .

*Id.* ISS contends that Dr. Lloyd's expert testimony lacks foundation and is inadmissible.

ISS has moved for summary judgment on both of Shaw's claims. ISS argues that Shaw does not meet the statutory definition of a "qualified individual" under the ADA and therefore his claims fail as a matter of law. On July 14, 2021, the Court heard oral argument on the motion for summary judgment.

## Discussion

Summary judgment is appropriate when there is no genuine dispute of material

fact and the movant is entitled to judgment as a matter of law.  *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012).  Facts are viewed in the light most favorable to the non-moving party.  *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771 (7th Cir. 2002).  Summary judgment is appropriate when no reasonable factfinder could find in favor of the non-moving party.  *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012).

"The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability."  *McKay v. Vitas Healthcare Corp. of Illinois*, 232 F. Supp. 3d 1038, 1043 (N.D. Ill. 2017) (Kennelly, J.) (citing 42 U.S.C. § 12112(a)); *see also Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001).  ISS argues that Shaw cannot establish that he meets the definition of a "qualified individual" with a disability and thus his ADA claims thus fail as a matter of law.  Def.'s Opening Mem. at 3-6 (dkt. no. 64).

## A.    Qualified individual

To determine whether a person is a "qualified individual" under the ADA, the Court engages in a two-part inquiry.  First, the Court considers whether the individual "satisfies the prerequisites for the position"—"such as possessing the appropriate educational background, employment experience, skills, licenses, etc."  *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241-42 (7th Cir. 2018); *Basith*, 241 F.3d at 927 (internal quotations omitted).  "If he does," then the Court determines "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation."  *Basith*, 241 F.3d at 927 (internal quotations omitted).

The plaintiff "bears the initial burden of establishing that [he] was a qualified

individual who could perform the essential functions of [the] position," "either with or without reasonable accommodation."  *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014); *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013).  Thus, to avoid summary judgment on his ADA claims, Shaw must establish a genuine factual dispute with respect to both parts of the qualified individual inquiry: "prerequisites" and "essential functions."  *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 780-81 (7th Cir. 2007) (internal quotations omitted); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014) (noting that being a "qualified individual" is an essential element a plaintiff must establish to prevail on a failure-to-accommodate claim); 42 U.S.C. § 12112(a).

### 1.     Prerequisites

ISS argues that Shaw "does not possess the prerequisite knowledge, skills and abilities to perform the Porter position" and he therefore cannot meet his burden under the first part of the qualified individual inquiry.  Def.'s Opening Mem. at 3-4; *Green v. Pace Suburban Bus*, No. 02 C 3031, 2004 WL 1574246, at *10 (N.D. Ill. July 12, 2004) ("A plaintiff's failure to satisfy step one of the two-part analysis requires a grant of summary judgment in favor of the defendant."); *Prado v. Cont'l Air Transp. Co.*, 982 F. Supp. 1304, 1306 (N.D. Ill. 1997) ("An ADA plaintiff bears the burden of meeting this threshold inquiry and failure to do so requires a grant of summary judgment."). Specifically, ISS contends that porters must possess certain "prerequisite knowledge, skills and abilities" that it says "are necessary for legitimate business reasons related to the position."  *See* Porter/Commissary Worker Job Description at 1-2; Def.'s Opening Mem. at 4.

In response, Shaw contends that the items listed in the "Knowledge, Skills & Abilities" section of the job description are not actual prerequisites, at least not in the manner the ADA contemplates. *See* Pl.'s Resp. Br. at 4-5. Shaw also contends that ISS's argument is flawed because the list of prerequisites on the job description is distinct from the prerequisites listed in ISS's statement of facts. *Id.* at 5. Shaw also suggests—and emphasized during oral argument—that "basic math skills" is too vague to be a prerequisite because it "lacks reference to *levels* of [math] skill." *Id.* "Without levels," Shaw argues, the math requirement "lacks guidelines and is not a prerequisite." *Id.*

"Nothing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers." *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998). Indeed, "[e]mployers are entitled to define the core qualifications for a position." *Leisen v. City of Shelbyville*, 153 F.3d 805, 808 (7th Cir. 1998). But the ADA imposes an important burden on employers: "[a]n employer may define the job in question, in terms of both its essential scope and the qualifications required for it, as long as such qualifications are *job-related* and *consistent with business necessity*." *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 929 (7th Cir. 2001) (internal quotations and citations omitted, and emphasis added); *see also Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000) ("Under the ADA, an employer can apply 'qualification standards' that deny a job to an individual with a disability as long as those standards are 'job-related and consistent with business necessity.'") (quoting 42 U.S.C. § 12113(a); 29 C.F.R. § 1630.15(b)(1)).

13

In *Lawson*, the Seventh Circuit addressed whether the employer's stated prerequisites were "genuine requirement[s]." *Lawson*, 245 F.3d at 929. The Court observed that some of the employer's stated requirements were "not among the prerequisites listed on [the employer]'s job description." *Id.* Regarding one prerequisite, which was not in the employer's written job description, the Court noted that the employer failed to provide any "guidelines defining [an] unstated qualification." *Id.* The Court therefore concluded that the plaintiff "put forward enough facts to create a jury question as to whether [the employer] consistently required applicants" to fulfill the prerequisites. *Id.* at 930; *see also Mashni v. Bd. of Educ. of City of Chicago*, No. 15 C 10951, 2017 WL 3838039, at *16 (N.D. Ill. Sept. 1, 2017) (concluding that there is a genuine issue of fact as to what a position actually required).

ISS's contention that the "prerequisites" on the written job description are "necessary for legitimate business reasons," Def.'s Opening Mem. at 4, is insufficient to establish that the prerequisites are genuinely related to the porter position and consistent with business necessity. Conversely, Shaw argues that a reasonable jury could find these are not actual prerequisites because (1) the skills ISS identifies are inconsistent with the requirements on the job description and (2) some of the items on the list are vague or lack sufficient guidelines.

For example, ISS lists specific job prerequisites in the written job description, but it also contends that the ability to communicate is a prerequisite, even though it does not appear in the job description. Def.'s Opening Mem. at 4. Further, with respect to the "basic math skills" prerequisite, ISS does not clarify the level of math that is required for the position and does not explain why the interview form included math questions

14

reflecting a financial transaction, even though porters do not handle cash. *Id.* at 4-6. Thus Shaw has "put forth enough facts to create a jury question" regarding the prerequisites of the porter position and whether he can satisfy them. *See Lawson*, 245 F.3d at 930.

Reviewing the record in the light most favorable to Shaw, there is a genuine factual dispute regarding the claimed prerequisites for the position. ISS is not entitled to summary judgment on the grounds that Shaw cannot satisfy prerequisites for the porter job. The Court therefore proceeds to the second part of the "qualified individual" inquiry: whether he can perform the essential functions of the position.

## 2. Essential functions

ISS also contends that Shaw cannot perform the essential functions of the porter position even with a reasonable accommodation. Shaw argues that there are genuine factual disputes on this score.[3] *Basith*, 241 F.3d at 927. ISS contends that the five essential functions of the porter position are not in dispute, Def.'s Opening Mem. at 6, but Shaw disagrees. Pl.'s Resp. Br. at 9 ("While it is not disputed that the job description *calls* those functions essential functions, it *is* disputed that those functions *really are* essential functions.").

The Seventh Circuit has made clear that "[w]hether a function is essential is a question of fact, not law." *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020). In determining a position's essential functions, factors that may be considered include: (1) "evidence of the employer's judgment of a position"; (2) "written

---

[3] Shaw "does not argue that he could perform the essential functions without an accommodation." Pl.'s Resp. Br. at 2 n.4.

job descriptions prepared before advertising or interviewing applicants for the job"; (3) "the work experience of past incumbents of the job"; and (4) "the work experience of current incumbents in similar jobs." *Basith*, 241 F.3d at 927 (citing 29 C.F.R. § 1630.2(n)(3)).  To establish the porter position's essential functions, ISS relies on the written job description for the position and the work experience of William Washington, who was previously a porter and is currently a commissary manager who supervises warehouse operations and oversees porters.  *See generally* Washington Dep.; Washington Decl. ¶¶ 1-26.

Although the ADA "explicitly gives 'consideration' to 'the employer's judgment as to what functions of a job are essential,'" 42 U.S.C. § 12111(8), the Seventh Circuit has instructed that "the employer's judgment is an important factor, but it is not controlling." *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011).  "We presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary."  *Gratzl v. Off. of Chief Judges of 12th, 18th, 19th, & 22nd Jud. Cirs.*, 601 F.3d 674, 679 (7th Cir. 2010) (citing *Basith*, 241 F.3d at 928).  The key question is whether ISS's description of the essential functions reflects actual practice.  *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 634 (7th Cir. 2020).

As a threshold matter, the Court notes that Shaw characterizes the porter position as two different jobs—a "concession porter" and a "warehouse porter."  The responsibilities for these two roles, Shaw says, are "so different that they have different essential functions and they should have different job descriptions," a point he also made during oral argument.  Pl.'s Resp. Br. at 10.  But there is no evidence in the record to support the proposition that there are actually two different positions.  Rather,

16

ISS expects porters to perform distinct tasks associated with both the warehouse and concession; there is no evidence giving rise to a genuine dispute about this. As ISS argues in its reply brief, it is "undisputed that all Porters must be capable of performing all of the essential functions for both assignments." Def.'s Reply Br. at 11 (dkt. no. 81).

"[I]f an employer has a legitimate reason for specifying multiple duties for a particular job, classification, duties the occupant of the position is expected to rotate through," as ISS does in this case, "a disabled employee will not be qualified for the position unless he can perform enough of these duties to enable a judgment that he can perform its *essential* duties." *Miller v. Illinois Dep't of Corr.*, 107 F.3d 483, 485 (7th Cir.1997). To the extent that Shaw suggests that ISS should separate the porter job into "concession" and "warehouse" positions, with separate job descriptions and distinct functions, the ADA imposes no such obligation on employers. *See Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002).

As previously indicated, ISS contends that the porter position has five essential functions. Porter/Commissary Worker Job Description at 1. ISS concedes that the HR manager, McCain, determined that Shaw can perform the fourth essential function: keeping the work area and equipment neat and clean. *Id.* at 1; Def.'s Resp. to Pl.'s Stat. of Facts ¶ 17. ISS contends, however, that Shaw cannot perform any of the position's other essential functions. The Court will therefore evaluate whether a reasonable factfinder could conclude that some or all the remaining functions are not actually essential.

### a. Delivery

First, ISS contends that porters must perform the essential function of delivering

"food, beverage and other products throughout the facility, in an efficient and timely manner."  Porter/Commissary Worker Job Description at 1.  ISS contends that porters (presumably when performing the concession assignment) travel to the warehouse with order forms, review those forms, and pull product, such as utensils or produce, from the warehouse for delivery to the various stand locations.  Def.'s Opening Mem. at 7-8.  The porter must then independently verify the accuracy of the product, as well as the amount, and seek out a supervisor to resolve any discrepancies.  *Id.* at 8; Def.'s Stat. of Facts ¶ 57.  Washington's deposition testimony and declaration indicates that porters, whether assigned to the warehouse or concession, generally assist the commissary manager and supervisors in "independently delivering product orders to various outlets on all floors within the stadium prior to and during events."  Washington Decl. ¶¶ 6, 16 ("Commissary[4] Porters must . . . deliver . . . product throughout the stadium at multiple locations during events.").

Shaw argues that this essential function is "required only of concession porters."  Pl.'s Resp. Br. at 11.  Shaw's contention lacks merit.  First, there is no evidence to support the contention that there are two distinct porter roles.  Moreover, based on Washington's declaration, ISS appears to assign this function to porters regardless of whether they are performing a concession assignment or a warehouse assignment, although Washington's deposition testimony suggests that porters perform this function more frequently when working at concession.  Washington Dep. 59:7-62:18.  Given the written job description and Washington's firsthand experience as a porter and current

---

[4] Washington testified that "commissary" is another word for "warehouse."  Washington Dep. 31:20-25.

commissary manager, no reasonable jury could conclude that the first function—delivery of products—is not essential to the porter position.

### b.    Stocking products

Next, ISS contends that it expects porters to stock product in the warehouse and ensure that inventory levels of supplies are maintained.  *See* Washington Dep. 31:20-25 (testifying that "commissary" is just another word for warehouse).  Washington's deposition, in which he discusses his own experience as a porter, indicates that stocking products and preparing stock orders is an essential function of the job of porter.  *Id.* at 30:7-16 (testifying that he prepared stock orders for concession stands as a porter), 47:24-48:7 (testifying that porters distribute the stock to the concession area from the warehouse), 50:19-21 (testifying that porters stock product obtained from the warehouse in other areas, such as concession), 107:18-25 (testifying that a porter assigned to concession counts stock and "takes it upstairs").  Finally, it appears from Washington's deposition testimony that porters, regardless of the duties to which they are assigned, may work together to fulfill orders.  *Id.* at 86:9-91:20.

Shaw again contends that this function is not required of porters assigned to concession.  But the record evidence—namely Washington's declaration deposition testimony—demonstrates that stocking products in commissary and maintaining inventory of supplies is expected of porters regardless of the specific duties to which they are assigned.  *See, e.g.*, Washington Decl. ¶¶ 7, 10, 17.  Based on the record, there is no genuine dispute about this.  No reasonable jury could find that stocking products is not an essential function for the porter job.

19

### c.    Remaining functions

Finally, ISS also contends that porters must report all needed commissary repairs to a supervisor and perform other duties as assigned.  Washington testified that porters assigned to concession are responsible for reporting repairs in concession locations and gave examples, such as changing light bulbs, grill malfunctions, and refrigeration issues.  Washington Dep. 144:19-146:6.  Washington's deposition testimony does not indicate whether porters working in the warehouse are expected to report that appliances or equipment need repair, although the job description specifically mentions "commissary" repairs, which is a reference to the warehouse, and his declaration indicates that porters working in the warehouse are responsible for reporting repairs as well.  *See* Washington Decl. ¶ 25 (explaining that porters performing warehouse duties are also responsible for reporting repairs).  Accordingly, the job description and Washington's deposition testimony and declaration reflect that ISS expects porters to perform this function in connection with both concession and warehouse responsibilities.  Def.'s Stat. of Facts ¶ 42.  The Court concludes that no reasonable jury could find that this task is not an essential function of the porter position.

By contrast, ISS does not cite any evidence supporting its claimed expectation that porters must "perform[] other duties as assigned."  Porter/Commissary Worker Job Description at 1.  In its opening memorandum, ISS summarily contends that "[a]s to the fifth essential function, the Porter must be able to comprehend and follow job procedures and supervisor instruction [sic]."  Def.'s Opening Mem. at 9.  This reads as a vague, open-ended, catch-all task.  The written job description, Washington's deposition

testimony, and his declaration do not specifically identify the "other duties" that fall within the fifth function either. Porter/Commissary Worker Job Description at 1. "An essential function is a *fundamental* job duty required of a person on the job." *Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015) ("a marginal duty is not an essential function") (emphasis added). There is no evidence in the current record to support the proposition that performing "other duties" is essential to the porter role, let alone what these duties might be. Accordingly, a reasonable jury could find that this is not an essential function.

In short, no reasonable jury could conclude, based on the summary judgment record, that the delivery of food, beverages and other products throughout the facility, in an efficient and timely manner; stocking products in commissary and ensuring that inventory levels of supplies are maintained; and reporting needed commissary repairs to the supervisor—are not essential functions of the porter position. Moreover, Shaw has not offered sufficient evidence to show that ISS's understanding of these essential functions is incorrect. *Basith*, 241 F.3d at 928. A reasonable jury could find otherwise, however, on the remaining functions claimed by ISS to be essential.

### d.   Shaw's ability to perform essential functions with a reasonable accommodation

The Court turns next to whether Shaw can, with a reasonable accommodation, perform the functions that ISS has established are essential to the porter position— delivering products, stocking products, and reporting the need for equipment/appliance repairs to supervisors. "Federal labor regulations define 'reasonable accommodation' as '[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held . . . is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that

21

position.'" *Mlsna*, 975 F.3d at 637 (quoting 29 C.F.R. § 1630.2(o)(1)(ii)).

Citing detailed factual statements about Shaw's impairment from the SSA record, ISS argues that Shaw cannot perform the essential functions of the job, even with a reasonable accommodation.  Def.'s Opening Mem. at 6-9.  Shaw disputes these contentions and argues that ISS inappropriately relies on the SSA record, which he says is neither sworn nor authenticated.  Pl.'s Resp. Br. at 8, 11-12.  ISS argues that it has submitted an authenticated copy of the SSA record.  Def.'s Reply Mem. at 8 n.3. As a general matter, the "receipt of Social Security disability benefits does not automatically disqualify a person from making a claim under the Americans with Disabilities Act," but "[l]itigants who take one view of the facts, and prevail, are equitably estopped to assert the opposite later."  *Opsteen v. Keller Structures, Inc.*, 408 F.3d 390, 392 (7th Cir. 2005) (explaining that plaintiff "wants to have things two ways, depicting himself as mentally incompetent in order to obtain disability benefits but as mentally capable in order to secure employment").  Nevertheless, the Court need not rely on ISS's invocation of the SSA record, because Shaw has not established a genuine factual dispute regarding ISS's contention that he cannot perform the position's essential functions with a reasonable accommodation.

As previously noted, Shaw relies on the expert report of Dr. Lloyd, a vocational rehabilitation consultant, to establish that he can perform the essential functions of a porter with a reasonable accommodation.  In short, Dr. Lloyd proposes the following accommodations:  "modified training, peer support, increased supervisory role, visual cues, gestural cues, equipment modification, switching tasks, informal networks, and natural supports."  Lloyd Expert Rep. at 32.

Dr. Lloyd does not have a client-counselor relationship with Shaw and has not met or spoken with him. ISS contends, partly on this basis, that Dr. Lloyd's opinions are inadmissible and lack foundation. That goes too far, as there are certainly circumstances in which an evaluation of sufficient relevant information would support admission of an expert opinion in this context. But this and other factors limit the probative value of Dr. Lloyd's opinions. Specifically, Dr. Lloyd states that, because of Shaw's "limited ability to engage in prolonged conversation," she conducted a vocational and rehabilitation assessment by interviewing Dr. Richmond, Shaw's mother, via phone. Lloyd Expert Rep. at 10. This means that her opinion effectively assumes that Dr. Richmond's account is a complete and reliable rendition of Shaw's capabilities. In addition, Dr. Lloyd concedes that her review of ISS's business functions was limited; other than reviewing the job description and filings from this case, she did not perform any other activities, such as an on-site job analysis, to determine the porter position's essential functions. *Id.* at 26-27 ("I was provided with a job description, but not a job analysis . . . [and] I was unable to conduct a job analysis" because ISS was closed for business due to the coronavirus pandemic). Dr. Lloyd did not, for example, conduct her own vocational assessment of Shaw. *Compare Peters v. Dielectric Corp.*, No. 18 C 811, 2019 WL 5298244, at (E.D. Wis. Oct. 17, 2019) (noting that the plaintiff personally underwent a vocational assessment, which informed the vocational experts' conclusions on her ability to do the job).

The larger problem with Dr. Lloyd's report, however, is her analysis of Shaw's ability to perform the porter job's essential functions. First, Dr. Lloyd takes the position, as a premise for her analysis, that there is not one porter position, but two. She says

"there should be separate job descriptions – concession and warehouse porter – as they perform different job duties."  Lloyd Expert Rep. at 30.  As the Court has indicated, however, ISS is not required to divide what the record demonstrates is a single job into two separate jobs as an accommodation.

But even if one disregards this shortcoming in Dr. Lloyd's analysis, her assessment of Shaw's ability to perform the various functions that ISS has shown are essential falls short of giving rise to a genuine issue of fact.  For each of these functions, Dr. Lloyd's assessment never gets beyond general statements that Shaw "may require modified training," "would most likely benefit" from certain cues, "would also benefit" from peer support and other assistance, and that certain instructional processes that she recommends "should be repeated until Mr. Shaw is able to perform these actions independently."  *Id.* at 33-34.  This falls short of an opinion that Shaw *could* perform the essential functions with the accommodations that Dr. Lloyd proposes.

In this sense, Dr. Lloyd's report "does not explicitly address" whether Shaw *actually could* "perform any of the tasks" associated with the porter position.  *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 690 (7th Cir. 2020).  For example, in her report, Dr. Lloyd infers, based on his ability to "learn[] through repeat demonstration," that this "will allow him to learn work tasks."  *Id.* at 29.  But she does not come right out and say that Shaw would be able to perform the specific functions ISS deems essential for the job—such as reporting equipment/appliance repairs to a supervisor.

More to the point, the proposed accommodations, in several instances, amount to requiring ISS to assign additional personnel to (effectively) shadow Shaw or provide, if not constant instruction, at least frequent and repeated instruction and assistance.

24

Part of what ISS contends about this is beyond what the record shows. The Seventh Circuit has repeatedly ruled that requiring an employer to provide a "helper" as an accommodation is unreasonable. *See Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002) (explaining that requesting someone else to "perform an essential function" of a job or "provid[ing] a helper as an accommodation" is unreasonable); *Miller*, 643 F.3d at 199 ("we have upheld determinations that requests for a 'helper' employee and requests to rotate work tasks were unreasonable"); *Lenker v. Methodist Hosp.*, 210 F.3d 792, 796 (7th Cir. 2000) (holding that calling for help from another employee is not a reasonable accommodation because, at times, other staff is not available to assist).

Dr. Lloyd's report reflects that the accommodations she proposes would require ISS to create an instructor position for Shaw or to assign ongoing instructional duties to an existing employee, for an indefinite period of time, to train Shaw and then ensure that he is carrying out his assigned duties. *See Dargis v. Sheahan*, 526 F.3d 981, 987 (7th Cir. 2008). The Seventh Circuit has held, however, that the ADA does not require this sort of an accommodation. *See Martinez v. Am. Airlines, Inc.*, 715 F. App'x 568, 569 (7th Cir. 2018) ("The ADA did not require American to train [plaintiff] for the staff support position. While some new training may always be required to bring new employees up to speed in a new position, the ADA 'does not require employers to offer special training to disabled employees.'") (quoting *Williams v. United Ins. Co. of America*, 253 F.3d 280, 282 (7th Cir. 2001)). In sum, the Court concludes that the evidence referenced by Shaw, including Dr. Lloyd's report, would not permit a reasonable jury to find that the proposed accommodations that Shaw would need to perform the job's functions are

25

reasonable.

Even if this were not the case, there is significant evidence that undercuts Shaw's contention that he can perform the functions of the porter position even with the proposed accommodations; no reasonable jury could conclude otherwise. "[T]he term 'reasonable accommodation' is expressly limited to those measures that will enable the employee to work." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017). For example, Dr. Richmond, Shaw's mother, and Dr. Hoban, Shaw's speech pathologist, both provide testimony that directly contradicts the proposition that Shaw could perform the essential functions of the porter position with a reasonable accommodation. *See, e.g.*, Richmond Dep. 104:3-5 (testifying that Shaw "has difficulty producing sounds of letters and words"); Hoban Dep. 22:10-18 (testifying that Shaw's global aphasia "impacted his comprehension for, like, one-step commands or yes/no questions" and "[h]is output, verbal output was limited to just a few words that were spontaneously produced"), 32:13-20 (testifying that Shaw "inconsistently followed simple one-step commands with visual/gestural queues [sic]").

Along these same lines, in his response to ISS's statement of facts, Shaw does not dispute that he "struggles with the ability to say what he wants to say and being understood"; that he "only comprehends 75% of what a person says to him and struggles with complex or abstract ideas"; that his "global aphasia limits his ability to . . . accurately respond to yes/no questions and identify written words and pictures"; and his "expression of 'yes' or 'no' responses is not always consistent or accurate." Pl.'s Resp. to Def.'s Stat. of Facts. ¶¶ 11-13; *see also* Def.'s Reply Br. at 1-2 (highlighting undisputed facts). Shaw also concedes that his "aphasia has left him primarily

nonverbal in his communication" which "means, if he were deposed, it is extremely likely that he would not be able to provide verbal or written answers in response to any question." Pl.'s Resp. to Def.'s Stat. of Facts ¶ 14. As of 2018 and 2019, he has "continued to suffer from limitations, including comprehension, completing tasks, speaking and an inability to accurately and efficiently communicate basic needs." *Id.* ¶ 18. And he does not dispute that he struggles to identify utensils. *Id.* ¶ 30.

All in all, the evidence in this case demonstrates that Shaw's limitations would prevent him from performing the porter's essential functions, even with the accommodations that are proposed. In the Court's view, no reasonable jury could reach a different conclusion. In particular, the record reflects that Shaw's cognitive limitations in following instructions, comprehending what is said to him, and identifying specific items would prevent him from performing a porter's essential functions of delivering products throughout the stadium in an efficient and timely manner and identifying the correct products; no reasonable jury could find otherwise. Similarly, Shaw has not shown the existence of a genuine dispute regarding his ability to stock products or maintain inventory levels with a reasonable accommodation, given his challenges with motor skills and performing tasks to completion. Finally, reporting the need for equipment and appliance repairs to supervisors—another essential function of the porter position—invariably involves some form of communication, verbal or written. The record lacks evidence from which a reasonable jury could conclude that Shaw can accurately identify and convey to a supervisor that there is a need for repairs.

In sum, the evidence is insufficient to permit a reasonable jury to find that Shaw would have been able to perform the essential functions of the job with a reasonable

accommodation.  Accordingly, he cannot prevail on his ADA claims.

## Conclusion

For the foregoing reasons, the Court grants the defendant's motion for summary judgment [dkt. no. 63] and directs the Clerk to enter judgment in favor of defendant and against plaintiff.  Defendant's motion to compel plaintiff's deposition [dkt. no. 47] is terminated as moot.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 9, 2021